**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

COREY LEE DOVE,

    Plaintiff,

    v.

WARDEN DENISE GELSINGER,
CORIZON HEALTH, INC.,
WARDEN GREGORY WERNER,
DR. ERWIN ALDANA,
COMMISSIONER OF CORRECTION,

    Defendants.

Civil Action No.:  JRR-23-163

**<u>MEMORANDUM</u>**

    Pending before the court in this civil rights case is Defendants Warden Gelsinger, Warden Werner, and the Commissioner of Correction's Motion to Dismiss (ECF No. 29) and Defendant Dr. Erwin Aldana's Motion to Dismiss or in the Alternative for Summary Judgment (ECF No. 31). Self-represented Plaintiff Corey Lee Dove opposes the motions.  (ECF No. 33.)  The court has reviewed all submissions and no hearing is necessary.  Local Rule 105.6 (D. Md. 2023).  For the reasons stated below, the pending motions shall be granted.[1]

**I.    Background**

    At the time he filed this Complaint pursuant to 42 U.S.C. § 1983, Plaintiff was incarcerated in the Maryland Correctional Institution-Hagerstown ("MCIH"); all allegations pertain to his medical treatment during his incarceration.  Plaintiff has since been released.

    This matter concerns Plaintiff's assertion that he was improperly taken off medication to treat his chronic pain.  He claims that he complained about not receiving his medications when

---

[1] The Complaint against Defendant Corizon Health, Inc. has been stayed after a suggestion of bankruptcy was filed. ECF No. 14.  Following dismissal of the claims against all other Defendants, the case as to Corizon Health, Inc. will remain stayed and administratively closed.

nurses failed to notify him that his prescription was soon to run out.  ECF No. 6 at 1 (Am. Comp.).
Plaintiff complains that the chronic care doctor gave him a one-month supply of his medication
instead of a three-month supply.  *Id*. at 2.  In an administrative remedy procedure complaint
("ARP"), Plaintiff complained that the medical staff was not giving him his medication in
retaliation for previous ARPs he filed, and that the "Pain Management Committee" decided to
discontinue his medications without having examined or consulted with him.  ECF No. 6-1 at 2-
3.[2]  Plaintiff adds that the chronic care doctor falsely claimed that the medications Plaintiff had
been prescribed previously were not being provided to any prisoners in the Maryland Division of
Correction.  ECF No. 6 at 2.

The medications Plaintiff was prescribed included Lyrica, Baclofen, and Elavil.  ECF No.
31-2 at 2, ¶ 4 (Decl. Aldana).  Plaintiff was prescribed these medications to treat nerve damage he
sustained to his left hand caused by an infection from a human bite.  Plaintiff underwent
debridement surgery in 2015 after the wound to his hand tested positive for MRSA.  The surgery
left Plaintiff with nerve damage to his hand.

Plaintiff's prescriptions for Lyrica and Baclofen were discontinued in 2022 after his case
was reviewed by a pain management panel.  According to Dr. Aldana, Gabapentin or Neurontin
"is an anticonvulsant used to treat seizures and is also prescribed to treat some types of nerve pain,
particularly shingles."[3]  ECF No. 31-2 at 2, ¶ 6.  Gabapentin is subject to abuse because it can
cause "a euphoric and dissociative effect" and as a result is "very sought after as a drug of abuse
in jails and prisons."  *Id*.  Due to these issues, Gabapentin is "carefully controlled in the prison
setting and only prescribed when absolutely necessary."  *Id*.  Lyrica is also an anticonvulsant and

---

[2] Plaintiff's ARP was dismissed.  The Warden stated that: "The pain panel meets to determine what is best for the patient.  If the pain panel decides certain medication are not in the patient's best interest, they are stopped.  The goal of pain management is to reduce your pain.  Chronic pain cannot be taken away completely."  ECF No. 6-1 at 1.
[3] Nothing in the record before the court indicates that Plaintiff was prescribed Neurontin during the relevant period.

is "used to treat seizures and provide pain relief for patients with fibromyalgia, diabetes, spinal cord injuries, or herpes zoster." *Id*. Dr. Aldana states that "Lyrica can be abused to feel euphoria, relaxation, and calmness." *Id*. Baclofen is a muscle relaxant; Cymbalta and Elavil are antidepressants often used to treat nerve pain. *Id*.

On February 23, 2021, when Plaintiff arrived at MCIH from Jessup Correctional Institution, he was prescribed Ibuprofen, Baclofen, Elavil, and Lyrica. *Id*. at 3, ¶ 7. Approximately two months following his arrival, on April 8, 2021, Plaintiff was seen by Dr. Jerry Ann Hunter, who noted that Plaintiff had "chronic pain syndrome due to a prior injury to his [left][4] hand." *Id*. at ¶ 8. Plaintiff told Dr. Hunter that the medications he was receiving were addressing his pain adequately and Dr. Hunter renewed the prescriptions with a plan to follow-up with Plaintiff in three months. *Id*. Dr. Aldana approved a "nonformulary drug request for Lyrica for 120 days" on April 22, 2021. *Id*.; *see also* ECF No. 31-7 at 2.

On July 21, 2021, Plaintiff was seen for chronic care by Dr. Abduzahed Jahed. ECF No. 31-2 at 3, ¶ 9. Dr. Jahed continued Plaintiff on Elavil, Baclofen, Lyrica, and Ibuprofen through October 21, 2021. *Id*., *see also* ECF No. 31-6 at 26-27. On August 20, 2021, Dr. Aldana submitted a non-formulary drug request ("NFDR") for a 30-day supply of Lyrica, which was approved. ECF No. 31-2 at 4, ¶ 1;, *see also* ECF No. 31-6 at 25. On September 28, 2021, LPN Melinda Lewis requested a referral to renew Plaintiff's Lyrica prescription. ECF No. 31-2 at 4, ¶ 10; *see also* ECF No. 31-6 at 24. On October 1, 2021, Dr. Aldana submitted another NFDR for a 120-day supply of Lyrica, which was also approved. ECF No. 31-2 at 4, ¶ 10; *see also* ECF No. 31-6 at 22. According to his medical records, Plaintiff received Elavil, Lyrica, and Baclofen twice a day from

---

[4] The medical records incorrectly state that the injury was to Plaintiff's right hand.

3

September 2021 through January 2022.  ECF No. 31-2 at 4, ¶ 10; *see also* ECF No. 31-8 at 12, 14, 16, 18, 20.

On February 5, 2022, when Plaintiff was seen by RN Coretha Tassi for a renewal of his medication prescriptions, he complained that he had submitted a written a sick call slip regarding his medications having expired two weeks prior thereto, and that he had run out of medication that day.  ECF No. 31-2 at 4, ¶ 11; *see also* ECF No. 31-6 at 19-20.  Plaintiff's medication had in fact expired on February 1, 2022.  ECF No. 31-2 at 4, ¶ 11.  Tassi referred Plaintiff to a provider for renewal of his medication.  *Id.*  Dr. Jahed saw Plaintiff three days later and his Lyrica prescription was renewed for 90 days.  *Id.*, *see also* ECF No. 31-6 at 17-18.  The request for Lyrica made by Dr. Jahed was approved by Dr. Tessema, but no refills were given because "the patient needed to be presented to the Pain panel."  *Id.*  On February 22, 2022, when Plaintiff was seen by Dr. Jahed again for chronic care, he was prescribed Elavil, Baclofen, Lyrica, and Ibuprofen through July 22, 2022, but Dr. Jahed also referred Plaintiff to the pain clinic for an evaluation of the Lyrica prescription.  *Id.* at ¶ 12, *see also* ECF No. 31-6 at 14-15.

On March 25, 2022, Plaintiff reported to sick call for complaints of pain in his hand and explained to RN Sherry Duncan that his Elavil prescription was renewed but only for one dose in the evening when it was supposed to be one in the morning and two at night.  ECF No. 31-2 at 4-5, ¶ 13; *see also* ECF No. 31-6 at 10.  Nurse Duncan spoke with Plaintiff's doctor and the error was corrected.  *Id.*  On April 29, 2022, Dr. Aldana saw Plaintiff for chronic care.  ECF No. 31-2 at 5, ¶ 15.  At that time, Plaintiff was taking Lyrica, Elavil, Baclofen, and Ibuprofen.  *Id.*  Dr. Aldana explains that Lyrica and Elavil were prescribed for treatment of Plaintiff's chronic pain, and Baclofen and Ibuprofen were prescribed for his acute pain caused by a fall Plaintiff had while trying to access the top bunk in his cell.  *Id.* at ¶¶ 14 and 15.  Dr. Aldana states that Lyrica,

4

Baclofen, and Ibuprofen were prescribed through July 22, 2022, and Elavil through July 25, 2022, for the evening dose and August 4, 2022, for the morning dose. *Id.* at ¶ 15.

Despite having prescriptions through July 22, 2022, for Lyrica, Baclofen, and Ibuprofen, Plaintiff's "medication expired May 8, 2022." ECF No. 31-2 at 5-6, ¶ 16; *see also* ECF No. 31-5 at 32. On May 21, 2022, when Plaintiff was seen by RN Marie Nguimbus for complaints of pain and not receiving pain medication, he was informed that there was an instruction for "no renewal" on his prescription with a note to "instead . . . present to pain panel." *Id.* Plaintiff was referred to a provider; however, he was seen twice more in sick call before seeing a provider. *Id.* at 6, ¶¶ 16, 17; *see also* ECF No. 31-5 at 24, 27-29.

Plaintiff was not seen at a "provider visit" until June 9, 2022, when he was seen by Dr. Jahed. ECF No. 31-2 at 6, ¶ 18; *see also* ECF No. 31-5 at 22. Dr. Jahed submitted an NFDR for Lyrica and a consultation request for the pain clinic; the following day, Dr. Tessema approved the Lyrica prescription for 30 days until Plaintiff could be reviewed by the Pain Committee. *Id.* Dr. Jahed also renewed Plaintiff's prescriptions for Baclofen, Elavil, and Ibuprofen. *Id.*

On June 27, 2022, Plaintiff was seen by Dr. Mahboobeh Memarsadeghi; Plaintiff expressed his concern about the pain in his hand and his inability to bend his index finger. ECF No. 31-2 at 7, ¶ 20, *see also* ECF No. 31-5 at 8-11. Dr. Memarsadeghi noted that Plaintiff had been on Lyrica since 2018; that the initial injury occurred in 2015; and that there was a referral for physical therapy in 2018 but no therapy was documented. *Id.* Plaintiff informed the doctor that putting pressure on his left hand caused sharp pain, which he described as "shooting type radiating to his whole left arm." *Id.* Plaintiff's left hand was scarred from the 2018 surgery and, at the time of this appointment, he could bend all of his fingers except the index finger. *Id.* Dr. Memarsadeghi prescribed Elavil, Baclofen, Ibuprofen, and Lyrica. *Id.*

5

Dr. Memarsadeghi saw Plaintiff again on July 11, 2022, for chronic care.  ECF No. 31-2 at 8, ¶ 21; *see also* ECF No. 31-5 at 3-5.  Plaintiff asked about his Lyrica prescription because it was about to expire.  *Id*.  Dr. Memarsadeghi informed the administrative manager so that Plaintiff could be seen in the pain clinic within the following two weeks.  *Id*.  Dr. Memarsadeghi prescribed Elavil, Lyrica, Ibuprofen, and Baclofen until October 1, 2022.  *Id*.

On July 18, 2022, RN Brenda Hose saw Plaintiff regarding his complaint that he had not received Lyrica "in days" and that it was needed to treat his chronic pain.  ECF No. 31-2 at 8, ¶ 22; *see also* ECF No. 31-5 at 1-2.  Plaintiff also complained that his wrist had been x-rayed following a fall injury, but that he had never been examined by a doctor following the x-ray.  *Id*.  Nurse Hose noted in the record that Plaintiff "is currently prescribed Lyrica until October 1, 2022;" upon her review of notes in Plaintiff's medical record, Nurse Hose determined that the Lyrica prescription submitted on June 9, 2022, had been renewed for only 30 days.  *Id*.  Plaintiff told Nurse Hose that his last dose of Lyrica was on July 13, 2022.  *Id*.  He further advised that the pharmacy was aware of the problem and was supposed to be working on it.  *Id*.  Nurse Hose advised Plaintiff that she would "consult with management and pharmacy to see if medication can be renewed."  ECF No. 31-5 at 1.

On July 26, 2022, the pain panel met to discuss Plaintiff's chronic pain.  ECF No. 31-2 at 8-9, ¶ 23; *see also* ECF No. 31-4 at 38-39.  After the panel "reviewed and discussed in detail" Plaintiff's plan of care, the panel concluded that, effective immediately, Plaintiff should no longer be prescribed Lyrica or Baclofen.  *Id*. at 38.  The panel also recommended that Plaintiff's Baclofen dose be tapered, noting that "muscle relaxants cannot be continued more than 3-6 weeks after an acute problem."  *Id*.  The panel approved Plaintiff to continue a low dose of Elavil.  *Id*.  Plaintiff alleges that he was never "tapered off" of Baclofen.  ECF No. 22-9.

On July 30, 2022, Plaintiff was told of the pain panel's decision regarding his Lyrica prescription when he reported for sick call requesting a refill because he had "shooting pain" in his left arm and could not function well without it.  ECF No. 31-2 at 9, ¶ 24; *see also*, ECF No. 31-4 at 35-37.  The RN noted that Plaintiff did not appear to be in distress, but that he was not pleased with the decision made and left the medical unit angry.  *Id*.

On August 23, 2022, Plaintiff was seen for chronic care by Dr. Memarsadeghi; they discussed the results of the pain management panel.  ECF No. 31-2 at 9, ¶ 25.  Plaintiff asked for the names of the members of the pain panel, threatened to sue everyone involved, and left the room.  *Id*.  Plaintiff continued to report to sick call through July and August 2022, complaining of daily pain and that he needed his medication to relieve his pain.  ECF No. 31-2 at 9-10, ¶¶ 26, 27, 28; *see also* ECF No. 31-4 at 19-21, 24-29.  During this time, Plaintiff was receiving Elavil for pain management.  *Id*.

On October 16, 2022, Plaintiff was seen in sick call complaining that his medication had not been "put in" and that he continued to be in daily pain.  ECF No. 31-2 at 10-11, ¶ 29; *see also* ECF No. 31-4 at 15-17.  RN Mandi Hart noted that Plaintiff's Elavil prescription expired on October 1, 2022; Nurse Hart referred Plaintiff to a provider for renewal of the prescription.  *Id*.  Despite that expiration, the Medication Administration Record ("MAR") showed that Plaintiff had received Elavil through the month of October.  *Id*.; *see also* ECF No. 31-7 at 34.  RN Amina Amisi, who saw Plaintiff in sick call on October 31, 2022, noted Plaintiff's complaint that his hand was still in pain, he needed Lyrica and Baclofen to manage the pain, and that "if they do not give them to him, he will sue the doctors."  ECF No. 31-2 at 11, ¶ 29; *see also* ECF No. 31-4 at 12.

Plaintiff saw RN Mary Tabe on November 8, 2022, for sick call and again complained of pain in his left hand and arm.  ECF No. 31-2 at 11, ¶ 30; *see also* ECF No. 31-4 at 7-8.  Plaintiff

told Nurse Tabe that he wanted a Lyrica refill. *Id.* Nurse Tabe referred Plaintiff to a provider, but Plaintiff returned two days later and reported to Nurse Tabe that he "jumped off the bunk and hit his hand on the bunk." *Id.; see also* ECF No. 31-4 at 5-6. Nurse Tabe noted that Plaintiff had blood around his fingers but found no deep lacerations or other injuries requiring intervention. *Id.*

Plaintiff continued to report to sick call for complaints of pain and requesting return of the medications he had been prescribed previously, *i.e.*, Elavil, Lyrica, Baclofen, and Ibuprofen. *See* ECF No. 31-2 at 11-2, ¶¶ 31, 32; ECF No. 31-3 at 37-40; ECF No. 31-4 at 1-2. On December 31, 2022, it was noted that Plaintiff was not on any medication. ECF No. 31-3 at 37. On January 4, 2023, Plaintiff was seen by Dr. Aldana for his chronic pain. ECF No. 31-2 at 12, ¶ 33, *see also* ECF No. 31-3 at 33-36. Dr. Aldana prescribed Elavil and Cymbalta to treat Plaintiff's pain. *Id.*

On January 16, 2023, Plaintiff reported to sick call and was seen by RN Quinta Kum for his complaints of daily pain, which he attributed to not receiving needed medication. ECF No. 31-2 at 12-13, ¶ 34, ECF No. 31-3 at 31-32. Plaintiff again reported for sick call two days later and was seen by RN Roseline Onyia for complaints of chronic pain. *See* ECF No. 31-3 at 29-30. Nurse Onyia submitted a referral for Plaintiff to be seen by a provider. *Id.* Similarly, on January 31, 2023, when Plaintiff reported to sick call, Nurse Onyia saw him and provided Plaintiff Ibuprofen for pain and referred him for a provider visit. *Id.* at 13, ¶ 35; ECF No. 31-3 at 18. Nurse Onyia noted that Plaintiff could not make a fist with his left hand and that he reported his current medication regimen was ineffective. *Id.*

Plaintiff reported these problems again on February 4, 2023, to RN Henrietta Darpoh. *Id.* at 13, ¶ 36; ECF No. 31-3 at 19-20. He returned on February 11, 2023, and told RN Evans Budu he wanted his medication. *Id.* at ¶ 37; ECF No. 31-3 at 15-17. Nurse Budu made Plaintiff aware of a note stating that Lyrica and Baclofen are not to be prescribed for Plaintiff. *Id.* Eight days

8

later, Plaintiff again complained to Nurse Budu about his pain, reported his pain as a level 5 out of 10, and that he was still waiting to be seen by chronic care for his pain.  ECF No. 31-2 at 14, ¶ 38.

After Plaintiff was seen twice in March 2023 for sick call complaints of pain during which he repeated his requests to restart Lyrica, he was referred to a provider by RN David Smith.  ECF No. 31-2 at 14, ¶¶ 49, 40; ECF No. 31-9 at 16-18; 21-24.  On April 3, 2023, Dr. Jahed saw Plaintiff for a provider visit.  ECF No. 31-2 at 14-15, ¶ 41; ECF No. 31-9 at 25-28.  Plaintiff told Dr. Jahed that the Cymbalta and Amitriptyline he was prescribed did not address his pain, and that he wanted to be put back on Lyrica and Baclofen, which did address his pain.  *Id*.  Dr. Jahed noted that Plaintiff's medical record had "prescribing alerts" for "active addiction" and a directive not to prescribe Lyrica or Baclofen as of July 2, 2022.  *Id*.  Dr. Jahed explained she could not change Plaintiff's prescriptions; in response, Plaintiff became argumentative and left the room.  *Id*.

On April 10, 2023, Plaintiff reported to sick call with swelling and warmth to his hand,[5] which had been present for three days.  ECF No. 31-2 at 15, ¶ 42; *see also* ECF No. 31-9 at 33-35.  Plaintiff was seen by a provider, assessed with cellulitis, and prescribed doxycycline for ten days.  *Id*.; *see also* ECF No. 31-9 at 36-37.  On April 12, 2023, Plaintiff's prescription was changed to Keflex and Bactrim, and he was provided Ibuprofen.  ECF No. 31-2 at 16, ¶ 43; *see also* ECF No. 31-9 at 41.  Later that day, Plaintiff was released from custody.

## II.    Standards of Review

### A.    Motion to Dismiss

Defendants Gelsinger, Werner, and the Commissioner of Correction style their motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6); the Medical Defendants move for dismissal or,

---

[5] It is unclear which hand was affected; the records refer to both Plaintiff's right and left hand.  *See e.g.*, ECF No. 31-9 at 36 and 38.

in the alternative, for summary judgment under Fed. R. Civ. P.  56.  ECF Nos. 29 and 31.  The Motion to Dismiss shall be considered without reference to any matters outside the pleadings; however, the motion filed by the Medical Defendants implicates this court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  Under Rule 12(b)(6), however, a court may exercise its discretion to consider matters outside of the pleadings. If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." FED. R. CIV. P. 12(d); *see also Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 F. App'x 220, 222 (4th Cir. Nov. 29, 2016) (*per curiam*). When the movant requests summary judgment "in the alternative" to dismissal, and submits matters outside the pleadings for the court's consideration, the parties are deemed on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 261 (4th Cir. 1998).

In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless the court provides 12(d) notice to the parties that it will do so.  *Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp*., 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not

exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Housing, LLC*, 672 F. App'x at 622 ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'") (citation omitted).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C Wright & Miller, Federal Practice & Procedure § 1366 at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action" and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

**B.     Summary Judgment**

Summary judgment is governed by FED. R. CIV. P. 56(a), which provides in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Moreover, the trial court may not make credibility determinations on summary judgment.  *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment.  *Id*. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."  477 U.S. at 252.  Similarly, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id*.

Because Plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## III. Discussion

### A. Personal Participation

Section 1983 imposes civil liability on a person who, under color of state law, deprives any citizen of the United States or other person under the jurisdiction thereof of any right secured by the Constitution or laws of the United States. It "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393-94, (1989)). In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor had actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate

13

indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.* (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, Plaintiff does not specifically allege any actions by Defendants Gelsinger, Werner, or the Commissioner of Correction. ECF Nos. 1, 6. Rather, it appears the reason Plaintiff included these Defendants in his action are their respective positions as supervisory personnel within the Division of Correction. As noted, however, a theory that a supervisor is liable simply by virtue of supervisor status is not cognizable in the context of section 1983 litigation. Accordingly, the Motion to Dismiss filed by Gelsinger, Werner, and the Commissioner of Correction shall be granted.

Plaintiff's claim against Dr. Aldana also lacks any specific allegation that Dr. Aldana was responsible for any deliberate act about which Plaintiff complains. Plaintiff does allege that Dr. Aldana was one of the chronic care doctors, but alleges that it was the pain panel that decided he could not receive Lyrica and Gabapentin. While it is unclear whether Dr. Aldana was a member of that panel because the names of the panel members are not provided in the record, Dr. Aldana's sporadic participation in Plaintiff's care, without more, is not enough to establish personal participation for purposes of section 1983. However, to the extent that Plaintiff simply neglected to name appropriate parties as Defendants, the complaint still fails to withstand summary judgment analysis.

### B.   Eighth Amendment – Medical Care

The Eighth Amendment of the United States Constitution prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto*

*v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016).  "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment."  *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need.  *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that: (1) objectively, the prisoner plaintiff suffered from a serious medical need; and (2) subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure it was available. *Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008); *see also Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (explaining that there is no expectation that prisoners will be provided with unqualified access to health care); and *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (holding that failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious

medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) (noting that "[t]rue subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Assuming without finding that Plaintiff's medical need was objectively serious, even in the light most favorable to Plaintiff, the medical care provided to him does not amount to a constitutional violation. "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate consequences." *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (describing the applicable standard as an "exacting" one). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985)

(citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference.").

Here, Plaintiff disagreed with the medical decision to treat his chronic pain with medications that do not present a danger of abuse or addiction, such as Lyrica or Baclofen. Whether Plaintiff received those medications prior to his incarceration, or after his release, is not relevant here. Medical care providers operating inside the confines of prison walls must make difficult decisions beyond simply alleviating symptoms. The undisputed facts on this record demonstrate that the medical staff made numerous efforts to address Plaintiff's chronic pain after he was taken off of Lyrica and Baclofen. Those efforts cannot be described as so grossly incompetent or inadequate as to shock the conscience or to be intolerable to fundamental fairness. *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994), *aff'd in pertinent part by Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732 (4th Cir. 2015); *see also Young v. Mt. Ranier*, 238 F.3d 567, 575 (4th Cir. 2001). Even evaluating the allegations in the light most favorable to Plaintiff, and construing his papers broadly and permissibly, there is no basis on which the court or a jury could reasonably conclude that the medical staff displayed a wanton disregard for Plaintiff's chronic pain. A defendant may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Thus, Dr. Aldana as well as all other unknown medical care providers are entitled to summary judgment in their favor.

## IV.   Conclusion

For the reasons stated herein, the Motion to Dismiss filed on behalf of Defendants Gelsinger, Werner, and Commissioner of Correction (ECF No. 29) shall be granted; the Motion to

Dismiss or in the Alternative for Summary Judgment filed on behalf of Defendant Dr. Erwin Aldana (ECF No. 31), construed as a Motion for Summary Judgment shall be granted; all claims against the unknown and unnamed medical care providers are dismissed; and all claims against Corizon Health are, and shall remain, stayed.  The case shall be closed as to the Defendant movants and administratively closed as to Corizon until such time as the automatic bankruptcy stay is no longer in effect.

      A separate Order follows.

/S/

_____

December 5, 2023

Julie R. Rubin
United States District Judge